UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Allco Renewable Energy Ltd.,
Otter Creek Solar LLC,
Thomas Melone, and
PLH Vineyard Sky LLC,

        Plaintiffs,

        v.                    Civil Action No. 2:20-cv-44-jmc

Joseph Kulkin, Jane Does 1–3,
John Does 1–3,

        Defendants.

## <u>OPINION AND ORDER</u>
(Doc. 12)

Plaintiffs Allco Renewable Energy Ltd., Otter Creek Solar LLC, Thomas

Melone, and PLH Vineyard Sky LLC, bring this diversity action against Defendants

Joseph Kulkin, Jane Does 1–3, and John Does 1–3, for defamation, injurious

falsehood, and tortious interference with a prospective contractual relationship.

(Doc. 1.)  Plaintiffs' claims stem from an alleged email communication sent by

Kulkin to Isovolta, Inc., a corporation negotiating a land access deal with Plaintiffs.

(*Id.* at 1, ¶ 1.)  Plaintiffs seek general and punitive monetary damages, and

reasonable attorney fees.  (*Id.* at 13.)

Kulkin has filed a one-page Motion to Dismiss Plaintiffs' Complaint (Doc. 12),

and Plaintiffs have filed an Opposition thereto (Doc. 15).  In response to the

Opposition, Kulkin has filed a document titled "Defendant's Response to Plaintiff's

Opposition to Motion to Dismiss" (Doc. 16), which the Court deems Kulkin's Reply to Plaintiffs' Opposition.  For the reasons stated below, Kulkin's Motion to Dismiss (Doc. 12) is DENIED.

## Factual and Procedural Background

The following facts are taken from the Complaint (Doc. 1), and are accepted as true for purposes of ruling on the pending Motion to Dismiss.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  On September 26, 2014, Plaintiffs purchased a 54.61-acre parcel of land off of Cold River Road in Rutland, Vermont (the "Solar Site"), in order to develop several solar facilities known as the Otter Creek 1, 2, and 3 solar projects ("OC1 Project," "OC2 Project," and "OC3 Project").  (Doc. 1 at 3, ¶¶ 5, 11.)  Although the Solar Site could be accessed from Cold River Road, Plaintiffs planned to clear the Solar Site and construct the solar facilities "from an access point off of Windcrest Road in the southwest corner of the Solar Site."  (*Id.* at 3–4, ¶ 11.)  To do so, Plaintiffs "needed to obtain either an easement or a lot line adjustment" from Isovolta, the owner of the neighboring lot, for a small section of land (the "Land Deal").  (*Id.* at 4, ¶ 11.)

Plaintiffs, through their agent Ecos Energy LLC, began negotiating the Land Deal with Isovolta in December 2015.  (*Id.* ¶ 12.)  Negotiations and the business relationship between the parties continued through 2016 and into 2017.  (*Id.*)  In March 2017, Ecos had an in-person meeting with Seth Howard, Isovolta's facilities

manager, wherein "both parties agreed there was a path forward for finalizing the Land Deal." (*Id.*)

On August 23, 2016, Plaintiffs filed petitions for certificates of public good ("CPGs") for the OC1 and OC2 Projects with the Vermont Public Utility Commission (the "PUC"), which are required under Vermont law for the construction of an electric generation facility. (*Id.* ¶ 13.) The petitions stated that site-clearing and construction would take place through the negotiated access road off of Windcrest Road. (*Id.*) The PUC granted Plaintiffs CPGs for the OC1 and OC2 Projects on February 27, 2018. (*Id.*) As of that date, Plaintiffs had not yet reached a final agreement with Isovolta regarding the Land Deal. (*Id.* ¶ 14.) In July 2018, Howard expressed to Plaintiffs that the Isovolta Rutland office still supported the Land Deal, but final approval would be required from Isovolta's corporate offices in Austria. (*Id.* at 4–5, ¶ 14.) By "late [f]all" of that year, the parties had resolved the remaining issues, and "the Land Deal was ready to close." (*Id.* at 5, ¶ 15.)

Around the same time, however, Defendant Kulkin sent an email to Isovolta urging them not to approve the potential Land Deal. (*Id.*) Specifically, on November 22, 2018, Kulkin sent an email warning Isovolta against granting access to the subject property to "the Melones," presumably referring to Plaintiff Thomas Melone, the sole owner of Plaintiffs Allco and PLH Vineyard Sky (*id.* at 3, ¶ 7), and one or more relatives of the same last name. (*Id.* at 1, ¶ 1; 5, ¶ 15; Doc. 1-1 at 2.) The email states, in relevant part: "The Melones are cancerous Wall Street snakes who have infected Vermont[,] and if you get involved with them you will find

3

yourself on the bad end of several lawsuits.  This has everything to do with how the Melones treat people—like garbage—in order to get what they want." (Doc. 1-1 at 2.)  The email also states that Isovolta would "rue the day forever" if it allowed the Melones access to the property, and advised that Kulkin could "put [Isovolta] in touch with someone who understands every aspect of th[e situation] and w[ould] gladly explain the finer details." (*Id.*)  From the date this email was sent through the remainder of 2018 and into early 2019, Plaintiffs received no communication from Isovolta or Howard, despite Plaintiffs' "multiple attempts" to contact them. (Doc. 1 at 5, ¶ 15.)  Thus, Plaintiffs began clearing the Solar Site using the access off Cold River Road.  (*Id.*)

On February 1, 2019, Ecos attempted to contact Isovolta's Austrian office directly, but still received no response.  (*Id.* ¶ 16.)  Finally, on March 27, 2019, Plaintiffs, Howard, and "an Austrian executive" participated in an in-person meeting in Rutland.  (*Id.*)  Although Isovolta was "willing to re-engage with the Land Deal, it was clear that [the company] had taken on a different negotiating position . . . in the wake of the November 22nd [e]mail, requiring . . . Plaintiffs to agree to pay an increased price in order to finalize the Land Deal." (*Id.*) Nonetheless, a final agreement was reached, and it was approved by Isovolta's Austrian office on April 24, 2019.  (*Id.* ¶ 17.)  After an error was discovered and corrected, the final agreement was executed on July 18, 2019.  (*Id.* at 5–6, ¶ 17.)

Jumping back in time, on January 30, 2019, Annette Smith, an "all[y]" of Kulkin, filed a complaint with the PUC, alleging that Plaintiffs "were violating the

CPGs [for the OC1 and OC2 Projects] by accessing the Solar Site from Cold River Road for site[-]clearing." (*Id.* at 6, ¶¶ 18–19.) In response to the complaint, on June 13, 2019, the PUC opened an investigation into the matter, precluding Plaintiffs from proceeding with construction of the OC1 and OC2 Projects. (*Id.* ¶ 20.) Specifically, while the investigation was ongoing, the PUC threatened to revoke the CPGs and the projects' power purchase agreements ("PPAs"), which are required in order to obtain financing to build solar projects (*id.* at 6–7, ¶ 21); and ultimately terminated the PPAs for the OC1 Project (*id.* at 7, ¶ 22). Accordingly, financing could not be obtained and the Projects could not be constructed for the duration of the investigation. (*Id.* ¶ 21.) In the end, however, the PUC "determined that the use of Cold River Road for clearing purposes was not a violation of the CPGs." (*Id.* at 6, ¶ 20.)

Given these alleged facts, Plaintiffs assert in the Complaint that, but for Kulkin's November 2018 email to Isovolta,

> (i) the Land Deal would have closed at the end of 2018 at a lower cost to the Plaintiffs, (ii) the clearing of the Solar Site that occurred in early 2019 would have occurred from off of Windcrest Road rather than off of Cold River Road, (iii) the PUC's investigations into the alternative use of Cold River Road, which precluded construction of the OC1 and OC2 Projects, would never have occurred, and (iv) the OC2 Project would have been constructed in calendar year 2019 in advance of the commissioning milestone of February 2, 2020.

(*Id.* at 7, ¶ 23.) Plaintiffs also allege that Kulkin has "established a pattern" of publishing Facebook posts containing "false, malicious, outrageous[,] and reprehensible defamatory statements against Plaintiffs." (*Id.* ¶ 24.) Based on these allegations, the Complaint assert claims of defamation, injurious falsehood, and

tortious interference with a prospective contractual relationship against Kulkin and several John/Jane Doe "co-conspirators."  (*Id.* at 1, ¶ 1.)

In his Motion to Dismiss the Complaint, Kulkin cites an April 16, 2020 decision by the PUC that rejected Plaintiffs' request to extend the commissioning milestone date for the OC2 Project.  (Doc. 12.)  Quoting the PUC's decision, the Motion argues as follows: (1) Otter Creek Solar LLC ("OCS") "had ample time to complete construction of the [P]roject after it finalized approval to access the project site from Windcrest Road[; t]hus, any difficulties in obtaining access to the site did not delay construction and do not warrant extending the commissioning deadline"; and (2) "the factors that led to the delays OCS allegedly experienced [as a result of the PUC's investigation] . . . were self-inflicted by OCS and wholly within its control."  (*Id.* (omission in original); *see also* Doc. 9-1 at 10.)  By relying on these statements from the PUC's decision, Kulkin apparently seeks to collaterally estop Plaintiffs from relitigating the issues of whether delayed Windcrest Road access prolonged construction and commissioning of the OC2 Project, and whether delays caused by the PUC's investigation into the use of Cold River Road access were "self-inflicted" by Plaintiffs.  More broadly, Kulkin's Motion appears to assert issue preclusion as to who is at fault for Plaintiffs' alleged injuries.

The Motion to Dismiss also argues that, "[i]f the [C]omplaint had any merit as to the claim of defamation, why did . . . [P]laintiff[s] wait almost two years to [file it?]."  (Doc. 12.)  The Court construes this as a claim that Plaintiffs' defamation

cause of action is untimely and therefore barred by the applicable statute of limitations.

As stated above, Plaintiffs have filed an Opposition to Kulkin's Motion to Dismiss, disputing both grounds argued in the Motion.  (Doc. 15.)  Moreover, Kulkin has filed a Reply, wherein he puts forth several additional arguments in support of his Motion.  (Doc. 16.)  Specifically, Kulkin asserts that: (1) by filing the Complaint in this case, Plaintiffs seek to relitigate the PUC's adverse April 16, 2020 decision; (2) Plaintiffs have failed to state a defamation claim because they have not established that the November 22, 2018 email caused the alleged harm, given that it was sent after the CPGs were issued for the OC1 and OC2 Projects and after Plaintiffs began construction; and (3) Plaintiffs' claims are frivolous, brought in bad faith and with unclean hands, and barred because Plaintiffs are libel-proof.  (*Id.*)

Oral argument on the Motion to Dismiss was held via videoconference on September 9, 2020.

## Analysis

## I.    Standard of Review[1]

In evaluating whether to dismiss a complaint for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6), the court tests the pleading for "facial plausibility."  *Ashcroft*, 556 U.S. at 678; *see Twombly*,

---

[1] Although this diversity action raises only state-law claims, federal pleading standards apply.  *See Eng v. City of New York*, 715 F. App'x 49, 52 (2d Cir. 2017) ("[State-law] claims, brought in federal court, are subject to the federal pleading standard, and not the relaxed pleading standards of New York state courts."); *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015) (reciting *Twombly* and *Iqbal* standards and stating, "[t]hese federal pleading rules and standards . . . prevail in all civil actions, including diversity litigation" (internal citation and quotation marks omitted)).

550 U.S. at 570 ("[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.").  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  This does not require a plaintiff to provide "detailed factual allegations" to support his claims, *Twombly*, 550 U.S. at 555, but plaintiffs must allege facts that permit "more than a sheer possibility that a defendant has acted unlawfully," *Iqbal*, 556 U.S. at 678.  *See Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level.").

In assessing the adequacy of the pleadings on a Rule 12(b)(6) motion to dismiss, a court must accept all factual assertions as true and draw all reasonable inferences in favor of the plaintiff.  *Lanier v. Bats Exch., Inc.*, 838 F.3d 139, 150 (2d Cir. 2016).  A complaint is properly dismissed where, as a matter of law, "the allegations in [it], however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

On a Rule 12(b)(6) motion to dismiss, "the [c]ourt is entitled to consider facts alleged in the complaint and documents attached to it or incorporated in it by reference," as well as "facts of which judicial notice may properly be taken." *Heckman v. Town of Hempstead*, 568 F. App'x 41, 43 (2d Cir. 2014).  For example, a

court "may take judicial notice of the records of state administrative procedures, as these are public records, without converting a motion to dismiss to one for summary judgment." *Evans v. N.Y. Botanical Garden*, No. 02 Civ.3591 RWS, 2002 WL 31002814, at *4 (S.D.N.Y. Sept. 4, 2002). However, a court may take judicial notice of such documents "only to establish their existence and legal effect, or to determine what statements [they] contained . . . [,] not for the truth of the matters asserted [therein]." *Liang v. City of New York*, No. 10–CV–3089 (ENV)(VVP), 2013 WL 5366394, at *5 (E.D.N.Y. Sept. 24, 2013) (first alteration and omission in original) (internal quotation marks omitted).

Because it is a public record of a state administrative proceeding, the Court takes judicial notice of the PUC's April 16, 2020 decision (Doc. 9-1), described above and discussed in detail below. *See Kavowras v. N.Y. Times Co.*, 328 F.3d 50, 57 (2d Cir. 2003) (taking judicial notice of employee's charge to the National Labor Relations Board, and stating: "[j]udicial notice may be taken of public filings"); *Mangiaracina v. BNSF Railway Co.*, Case No. 16-cv-05270-JST, 2019 WL 1975461, at *4 (N.D. Cal. Mar. 7, 2019) (taking judicial notice of "orders and decisions of the California Public Utility Commission"); *Office of Pub. Util. Counsel v. Pub. Util. Comm'n of Texas*, 878 S.W.2d 598, 600 (Tex. 1994) (holding that appellate court erred by refusing to take judicial notice of published order of the Public Utility Commission). The Court also takes judicial notice of the docket sheet in PUC Case No. 20-0233-PET, which reveals that on May 14, 2020, Plaintiffs filed a motion for reconsideration of the PUC's April 16 decision, and that motion is currently

pending.[2]  Of course, the Court takes judicial notice of these documents only to establish their existence and legal effect, not for the truth of the matters asserted therein.[3]  *See Liang*, 2013 WL 5366394, at *5.

## II.   Issue Preclusion

Kulkin appears to assert that, because the PUC found in its April 16, 2020 decision that "any delays in construction because of issues with Windcrest Road resulted from . . . [P]laintiff[s'] self-inflicted actions," Plaintiffs cannot relitigate the issue of the cause of their construction delays.  (Doc. 12 at 1 (internal quotation marks omitted).)  In response, Plaintiffs contend that OCS "continues to vigorously dispute the accuracy of that statement"; a motion for reconsideration of the PUC decision is "currently pending" before the PUC; and Kulkin has failed to make any showing regarding the criteria for issue preclusion to apply.  (Doc. 15 at 2–3.)

Issue preclusion, also known as collateral estoppel, "may be decided on a motion to dismiss," *Peralta v. St. Luke's Roosevelt Hosp.*, No. 14 Civ. 2609(KPF), 2015 WL 3947641, at *4 (S.D.N.Y. June 26, 2015), and thus the Court considers it here.  Under the doctrine of issue preclusion, "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case."

---

[2]  The docket and filings in PUC Case No. 20-0233-PET are publicly available in the Vermont PUC's online document-management system, located at https://epuc.vermont.gov/?q=node/89.

[3]  Plaintiffs argue that the PUC's April 2020 decision is irrelevant to the question of liability and constitutes hearsay evidence that should be excluded from the Court's consideration.  (*See* Doc. 15 at 3.)  Given that the Court is merely taking judicial notice of the existence of the decision, and not considering it for the truth of the matters asserted therein, there is no need to make rulings on these arguments.

*Allen v. McCurry*, 449 U.S. 90, 94 (1980); *Burgos v. Hopkins*, 14 F.3d 787, 789 (2d Cir. 1994); *see Wachtmeister v. Swiesz*, 59 F. App'x 428, 429 (2d Cir. 2003) (holding that dismissal is appropriate under issue preclusion when "it is clear from the face of the complaint, and consideration of matters which the court may take judicial notice of, that the plaintiff's claims are barred as a matter of law"). The doctrine, along with the doctrine of claim preclusion/res judicata, "express[es] no more than the fundamental principle that once a matter has been fully and fairly litigated, and finally decided, it comes to rest." *Girolametti v. Michael Horton Assocs., Inc.*, 173 Conn. App. 630, 650, 164 A.3d 731, 744 (2017) (internal quotation marks omitted), *aff'd*, 332 Conn. 67, 208 A.3d 1223 (2019). In considering whether the doctrine of issue preclusion applies to bar disputes in diversity cases like this, "federal law incorporates the rules of preclusion applied by the State in which the rendering court sits." *Taylor v. Sturgell*, 553 U.S. 880, 891 n.4 (2008). Therefore, the Court looks to Vermont law to determine whether issue preclusion applies here.

The Vermont Supreme Court has held that issue preclusion applies "only when the following criteria are met":

> (1) preclusion is asserted against one who was a party or in privity with a party in the earlier action; (2) the issue was resolved by a final judgment on the merits; (3) the issue is the same as the one raised in the later action; (4) there was a full and fair opportunity to litigate the issue in the earlier action; and (5) applying preclusion in the later action is fair.

*Trepanier v. Getting Organized, Inc.*, 155 Vt. 259, 265, 583 A.2d 583, 587 (1990). No single test is determinative as to the last two criteria, which must be considered on a case-by-case basis. *Id.* Moreover, "[p]reclusion applies only to issues necessarily

11

and essentially determined in a prior action." *In re P.J.*, 2009 VT 5, ¶ 12, 185 Vt. 606, 969 A.2d 133 (mem.) (internal quotation marks omitted).  Mutuality is no longer required under Vermont law.  *See Trepanier*, 155 Vt. at 162, 582 A.2d at 116. Issue preclusion may apply not only to court findings, but also to findings contained in administrative proceedings "if the agency was acting in a judicial capacity." *Ernst v. Kauffman*, 50 F. Supp. 3d 553, 569 (D. Vt. Sept. 30, 2014) (citing *Sheehan v. Dep't of Emp. and Training*, 169 Vt. 304, 308, 733 A.2d 88, 91 (1999)).

The determination of whether issue preclusion applies is a fact-intensive inquiry that is to be made on a case-by-case basis.  Here, neither party has meaningfully applied the elements of issue preclusion to the facts of this case nor have they adequately addressed whether the PUC was acting in a judicial capacity when it rendered its April 2020 decision.  Accordingly, the Court declines, at this stage, to determine whether issue preclusion applies to the PUC's statements identified by Kulkin in his Motion to Dismiss.[4]  *See Dipinto v. Westchester Cty.*, No. 18-CV-793 (KMK), 2019 WL 4142493, at *6 (S.D.N.Y. Aug. 30, 2019) (declining to consider, at motion to dismiss stage, whether issue preclusion applied because defendants' argument, "which [ran] to less than a single paragraph . . . , d[id] not meaningfully apply the collateral estoppel case law to the facts of th[e] case"); *see also Thomas v. Parker*, No. CIV–07–599–W, 2008 WL 9356286, at *2 (W.D. Okla. May 27, 2008) (declining to decide whether issue preclusion applied where

---

[4] Even if the Court were to determine that issue preclusion applied to bar relitigation of the PUC's findings in this lawsuit, no entire claim alleged in the Complaint would be barred on that ground.

defendants did not "undertake[] the task of analyzing whether principles of issue preclusion apply to bar litigation of some or all of Plaintiff's claims").  Kulkin's Motion to Dismiss on the ground of issue preclusion is therefore DENIED.

## III.   Timeliness of Defamation Claim

Kulkin also appears to argue that Plaintiffs' defamation claim is untimely. (*See* Doc. 12 at 1 ("[W]hy did . . . [P]laintiff[s] wait almost two years to bring the [C]omplaint[?]").)  Under Vermont law, a defamation claim, including claims for both libel and slander, must be brought within three years after the cause of action accrues.[5]  12 V.S.A. § 512(3); *see Tindall v. Poultney High Sch. Dist.*, 414 F.3d 281, 284 (2d Cir. 2005).  "A cause of action in defamation is generally said to accrue on the date of publication or circulation."  *Dulude v. Fletcher Allen Health Care, Inc.*, 174 Vt. 74, 85, 807 A.2d 390, 399 (2002).  Here, the cause of action accrued on November 22, 2018, the date on which Plaintiffs allege Kulkin sent the email to Isovolta.  (Doc. 1 at 1, ¶ 1; 5, ¶ 15).  The defamation claim is therefore timely because the Complaint was filed well within three years of that date.  Accordingly, Kulkin's Motion to Dismiss this claim on the ground of untimeliness is DENIED.

---

[5]  Because the Court has diversity jurisdiction over this matter, pursuant to 28 U.S.C. § 1332(a)(1), it must apply Vermont law in deciding all substantive issues.  *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state."); *Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 443 (2d Cir. 2005) ("In a diversity case we apply the substantive law of the forum state . . . .").  Statutes of limitation are considered "substantive" issues for *Erie* purposes. *See Guaranty Trust Co. of N.Y. v. York*, 326 U.S. 99, 110 (1945) ("[A] statute that would completely bar recovery in a suit if brought in a State court bears on a State[-]created right vitally and not merely formally or negligibly.  As to consequences that so intimately affect recovery or non-recovery[,] a federal court in a diversity case should follow State law.").

**IV.    Additional Arguments in Kulkin's Reply**

Kulkin advances several new arguments in his Reply.  (Doc. 16.)  As a general matter, courts will not consider arguments like this that are raised for the first time in a reply brief.  *See Valerio v. City of New York*, 18-CV-11130 (JPO), 2020 WL 353749, at *5 (S.D.N.Y. Jan. 21, 2020); *U.S. Engine Prod., Inc. v. ISO Grp., Inc*, No. 12–CV–4471(JS)(GRB), 2013 WL 4500785, at *8 (E.D.N.Y. Aug. 20, 2013).  Nevertheless, because Kulkin is a *pro se* defendant, the Court will briefly address his additional arguments.

Kulkin argues that "there is an appeal in [t]his matter in another legal platform," apparently referring to Plaintiffs' pending motion for reconsideration before the PUC.  (Doc. 16 at 4; *see also id.* at 3 (accusing Plaintiffs of "court gerrymandering").)  In essence, because there are some overlapping relevant facts, Kulkin seems to view this lawsuit and the PUC action as the same, and considers this lawsuit as merely an attempt by Plaintiffs' to relitigate the PUC's April 16, 2020 decision.  Accordingly, he seeks to have this action dismissed on the basis of claim preclusion, otherwise known as res judicata.  However, Plaintiffs' claims are plainly not precluded because none of the causes of action plead in the Complaint were asserted or litigated before the PUC.  Plaintiffs' pending motion for reconsideration pertains to the PUC's denial of their request to extend the commissioning deadline for the OC2 Project; it is not an "appeal" regarding any defamation claim, as Kulkin implies.  More importantly, the causes of action alleged in this lawsuit could not have been raised in the PUC proceeding: the PUC's

14

decision explicitly states that the PUC has "no jurisdiction" over Plaintiffs' ongoing dispute with Kulkin.  (Doc 9-1 at 13.)  To the extent Kulkin relies on the PUC's statement that the subject November 2018 email was "immaterial" to its determination because any delay caused by the email did not prevent Plaintiffs from meeting the commissioning deadline (*id.*), even if the statement applied for *issue* preclusion purposes, it does not warrant dismissal of any of the four *claims* plead in Plaintiffs' Complaint because these claims also include allegations of other injuries stemming from the email.

Kulkin also argues that Plaintiffs have failed to state a claim because the subject email could not have caused the alleged harms.  First, he posits that the email could not have caused Plaintiffs' injuries because it was sent in November 2018, ten months *after* Plaintiffs were issued CPGs for the OC1 and OC2 Projects.  (Doc. 16 at 2–3.)  At oral argument, Kulkin further explained that his email could not have caused the alleged harm because Plaintiffs were allowed to commence construction upon issuance of the CPGs in February 2018, before the email was sent.  He contends that, under Vermont law, Plaintiffs were required to have "site control" in order to obtain the CPGs, which he argues means that they should have closed the Land Deal by the date the CPGs were issued.  He argues it is Plaintiffs' own fault they did not have the easement or site control by that date, not Kulkin's email, sent ten months later.  Therefore, Kulkin submits, it is impossible for his email to have caused the alleged delays and, because Plaintiffs cannot establish the required element of causation, they have failed to state a claim.  In response,

Plaintiffs argue that on the date the CPGs were issued, they had site control and access to the site off of Cold River Road.  They claim that the CPGs were issued subject to satisfaction of the condition that they would obtain access to the Solar Site off of Windcrest Road for purposes of construction.  Therefore, Plaintiffs contend that they were issued a valid CPG, but could not begin construction until the conditions were satisfied—in other words, until the Land Deal closed.  Plaintiffs state that, after the CPGs were issued in February 2018, they were working through an unrelated issue with Isovolta until the fall of 2018 and were near closing of the Land Deal when Kulkin's email was sent, which then caused further delays and increased costs.  Because these purported facts are unalleged in the Complaint, the Court does not consider them in ruling on the instant Motion.  Moreover, these arguments turn on disputed issues of fact, and are therefore inappropriate for resolution on a motion to dismiss.  *See Hopkins v. Booth*, 16-CV-01020V(F), 2019 WL 2422615, at *5 (W.D.N.Y. Feb. 20, 2019).

Second, Kulkin argues that the email could not have caused construction delays or "financial losses" because, again, it was sent *after* Plaintiffs had already begun construction.  (Doc. 16 at 2.)  In so arguing, Kulkin apparently contends that Plaintiffs began construction on some date prior to November 22, 2018.  But the Complaint alleges that Plaintiffs did not begin site-clearing until "late fall of 2018 or early winter of 2019" (Doc. 1 at 5, ¶ 15), and did not begin construction until some date after June 13, 2019 (*id.* at 6, ¶ 20).  Of course, the Court accepts these

16

factual allegations as true for purposes of ruling on the instant Motion.  *See Lanier*, 838 F.3d at 150.

Alternatively, Kulkin argues that Plaintiffs' claims should be dismissed because they are frivolous and brought in bad faith.  (Doc. 16 at 2–4.)  "A court may dismiss a claim as 'factually frivolous' if the sufficiently well-pleaded facts are 'clearly baseless'—that is, if they are 'fanciful,' 'fantastic[,]' or 'delusional.'"  *Gallop v. Cheney*, 642 F.3d 364, 368 (2d Cir. 2011) (quoting *Denton v. Hernandez*, 504 U.S. 25, 32–33 (1992)).  Here, there is no evidence to suggest that Plaintiffs' claims are "clearly baseless," i.e., fanciful, fantastic, or delusional.  To the contrary, Plaintiffs' Complaint sets forth detailed factual allegations and there is no indication that these allegations are "spun entirely of cynical delusion and fantasy," as required for a dismissal on the basis of factual frivolity.  *Id.* at 369 (internal quotation marks omitted).  Thus, the Court declines to dismiss Plaintiffs' claims as frivolous.

Kulkin also broadly asserts that Plaintiffs' allegations "lack integrity and distort the truth."  (Doc. 16 at 2.)  He essentially claims that Plaintiffs have brought this action in bad faith and with unclean hands because it was their own misrepresentations to the PUC that caused their alleged injuries.  Specifically, Kulkin contends that, although site control is required to obtain a CPG, Plaintiffs did not have site control of the Solar Site at the time the CPGs were issued.  (*Id.*)  He asserts Plaintiffs had several opportunities to disclose that fact to the PUC "but instead chose deceit by silence."  (*Id.*)  The doctrine of unclean hands precludes a plaintiff from "obtaining equitable relief when his own bad faith conduct

precipitated the claim presented." *McDonald v. Elkholy*, 16 CV 2201 (AMD)(LB), 2017 WL 3503385, at *4 (E.D.N.Y. July 27, 2017). Although this doctrine is an affirmative defense, it may be raised in a motion to dismiss "if the defense appears on the face of the complaint." *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998). Dismissal is proper only if it is clear on the face of the complaint that the "immoral, unconscionable conduct" complained of, is "directly related to the subject matter in litigation and the party seeking to invoke the doctrine was injured by such conduct." *Genger v. Genger*, 76 F. Supp. 3d 488, 502 (S.D.N.Y. 2015) (internal quotation marks omitted). Moreover, the doctrine is an "equitable defense to equitable claims," such that a defendant cannot raise it to defeat a claim for damages in an "action at law." *Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 607 (2d Cir. 2005).

Here, it is not clear from the face of Plaintiffs' Complaint that their alleged injuries were precipitated by their own "bad faith" conduct. *See McDonald*, 2017 WL 3503385, at *4 ("On a motion to dismiss, the Court cannot look beyond the complaint to find that the doctrine of unclean hands precludes plaintiff's claims for equitable relief."). Moreover, even if the Court could consider Kulkin's allegations of Plaintiffs' bad faith conduct, there is no evidence that Kulkin was actually injured by this conduct. Furthermore, Plaintiffs seek no equitable relief in this case; they seek only monetary damages. (*See* Doc. 1 at 12–13.) As such, the doctrine of unclean hands does not apply and cannot defeat Plaintiffs' claims.

18

Finally, Kulkin argues that Plaintiffs' defamation claim should be dismissed because Plaintiffs are "libel-proof." (Doc. 16 at 4.) The "libel-proof plaintiff doctrine" endorses the notion that "a plaintiff's reputation with respect to a specific subject may be so badly tarnished that he cannot be further injured by allegedly false statements on that subject." *Frydman v. Verschleiser*, 172 F. Supp. 3d 653, 672 (S.D.N.Y. 2016) (quoting *Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298, 303 (2d Cir. 1986)). Thus, "if there is little or no harm to a plaintiff's already low reputation, then the statements are not actionable." *Cerasani v. Sony Corp.*, 991 F. Supp. 343, 352 (S.D.N.Y. 1998). However, "[t]he libel-proof plaintiff doctrine is to be applied with caution, since few plaintiffs will have so bad a reputation that they are not entitled to obtain redress for defamatory statements." *Guccione*, 800 F.2d at 303 (citation omitted); *see Liberty Lobby, Inc. v. Anderson*, 746 F.2d 1563, 1568 (D.C. Cir. 1984) ("[W]e cannot envision how a court would go about determining that someone's reputation had already been 'irreparably' damaged—*i.e.*, that *no* new reader could be reached by the freshest libel."), *vacated on other grounds*, 477 U.S. 242.

The Vermont Supreme Court has not discussed the libel-proof plaintiff doctrine, let alone adopted it. But even assuming the doctrine is a valid defense to a defamation claim under Vermont law, it would not apply to dismiss Plaintiffs' Complaint, as the doctrine is suitable only "in cases where the truth or undisputed evidence of a plaintiff's past had already severely damaged the plaintiff's reputation." *Broome v. Biondi*, No. 96 CIV. 0805 RLC, 1997 WL 83295, at *4

(S.D.N.Y. Feb. 10, 1997) (internal quotation marks omitted).  Kulkin has made no showing of these facts here, nor would the Court be allowed to consider such facts on a motion to dismiss.  Accordingly, Kulkin's Motion to Dismiss Plaintiffs' defamation claim because Plaintiffs are libel-proof is DENIED.

## Conclusion

For these reasons, Kulkin's Motion to Dismiss (Doc. 12) is DENIED.

Dated at Burlington, in the District of Vermont, this 2nd day of November 2020.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge